NORTH STATE LAW ENFORCEMENT
OFFICERS ASSOCIATION, et al.,
Plaintiffs,

v.

CHARLOTTE–MECKLENBURG
POLICE DEPARTMENT, et
al., Defendants.

Civ. A. No. 2938.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 16, 1994.

James E. Ferguson, II, Geraldine Sumter, Stephanie H. Webster, Charlotte–Mecklenburg Police Dept., Charlotte, NC, for plaintiffs.

Jim D. Cooley, F. Lane Williamson, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for defendants.

### MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Defendants'[1] motion, filed February 9, 1994, pursuant to Fed.R.Civ.P. 60(b)(5) and 60(b)(6), to terminate a consent decree entered by Judge James B. McMillan on January 9, 1974, and subsequently amended on

---

1. The City of Charlotte, North Carolina was an original party to this action. However, the City was dismissed by order of the Court in its consent decree filed January 9, 1974. Accordingly,

May 1, 1979 and July 2, 1990. Plaintiffs responded on March 2, 1994 requesting a period of discovery to evaluate whether the termination of the order will result in resegregation of the Charlotte Police Department, obtain information concerning the Department's testing and other employment policies and practices, and to evaluate those testing and employment policies and practices. The Court granted this request and allowed the parties to conduct discovery for a three week period to be followed by a period of briefing. The parties have briefed the motion. On July 29, 1994 the Court also held an evidentiary hearing, at Plaintiffs' request, during which it heard testimony, admitted several exhibits, and heard oral argument. Having now carefully considered the entire record together with the relevant legal standards, the Court makes the following findings of fact and conclusions of law.

### LEGAL STANDARDS

Motions pursuant to Federal Rule of Civil Procedure 60(b)(5) and (6) to terminate consent decrees must be evaluated by "a less strident, more flexible standard" than the "grievous wrong" standard embodies in *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, ——, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992). This flexible standard is two-pronged and allocates to the "party seeking modification ... the burden of establishing ..." the two prerequisites to termination. *Id.* at ——, 112 S.Ct. at 760. The first prong is satisfied "by showing either a significant change in factual conditions or in law." *Id.* Once this burden is satisfied, proof of the second prong, which requires that "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." is necessary. *Id.*

#### 1) Changed Factual or Legal Circumstances
##### a) Changed Facts

There are three instances in which changed factual circumstances warrant modi-

---

the remaining defendants include, *inter alia*, the Chief of Police, Dennis Nowicki, the Charlotte–Mecklenburg Police Department, and the Civil Service Board.

fication of a consent decree. The first is presented where the changes "make compliance with the decree substantially more onerous." *Id.* The second arises where, "a decree proves to be unworkable because of unforeseen obstacles." *Id.* The third is presented where "enforcement of the decree without modification would be detrimental to the public interest." *Id.*

### b) Changed Laws

"A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Id.* at ——, 112 S.Ct. at 762. That is, "a *rising* constitutional floor—or, ... a falling constitutional ceiling—may make modifications necessary." *Ensley Branch, N.A.A.C.P. v. Seibels,* 20 F.3d 1489, 1504 (11th Cir.1994).

### 2) Suitable Tailoring

■■■ Before granting a request under Rule 60 to modify a consent decree, "the District Court should determine whether the proposed modification is suitably tailored to the changed circumstances." *Rufo,* 502 U.S. at ——, 112 S.Ct. at 763. "This requires the court to determine the appropriate scope of the changes, accepting only proposals that are 'suitably tailored' to address significant factual developments or conflicts between new legal standards and the requirements of the decree." *Ensley Branch,* 20 F.3d at 1504. It also involves "a flexible 'exercise of that court's equitable power,' ... [which] is not unlimited." *Id., citing, United States v. City of Miami,* 2 F.3d 1497, 1509 (11th Cir. 1993). In evaluating whether the proposed

change fits the changed facts or law, it must be clear the change does not "create or perpetuate a constitutional violation." *Rufo,* 502 U.S. at ——, 112 S.Ct. at 763. Additionally, the proposed change must be "tailored to resolve the problems created by the change in circumstances" rather than seek to "conform[ ] to the constitutional floor." *Id.* at ——, 112 S.Ct. at 764. Furthermore, the "public interest" consideration requires "the district court [to] defer to local government administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform...." *Id.*

### FACTUAL FINDINGS

North State Law Enforcement Officers Association (North State) is an organization consisting of black law enforcement officers, including some employed by the Charlotte–Mecklenburg Police Department (the Police or Police Department).[2] On August 13, 1971, North State and others filed this action against the City of Charlotte, the Charlotte Police Department and others seeking declaratory and injunctive remedies for the Police Department's alleged racially discriminatory employment practices. This action was settled by a consent order of injunction entered by United States District Court Judge James B. McMillan on January 9, 1974, and supervised by this Court since that time.

### 1) The Consent Decree

The consent order provides for several remedies all focused on its essential purpose: achieving the "black employment, promotion, and assignment goals set forth herein...." Consent Decree of January 9, 1974 p. 3 ¶ 9.[3]

---

2. When the consent order at stake in this motion was entered on January 9, 1974, the Charlotte Police Department was a party together with the City of Charlotte. In 1993, the Charlotte Police Department merged with the Mecklenburg County Police Department. The resulting consolidated police force, the Charlotte–Mecklenburg Police Department, is thus comprised of two forces; one of which was not originally subject to the consent order. The consolidated force, however, is subject to the consent order. Consequently, the Court will make no distinctions between the two forces because, for purposes of this motion, they are interchangeable.

3. The Supreme Court has said, "the 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.' " *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984) (citations omitted). The Court concludes this is the essential purpose of the decree because it is the only factually supported conclusion available to it. Any other conclusion would require the Court to assume facts not in the record, or resolve facts both

No mention is made in the order of why these goals were established. Judge McMillan made no finding of present or past racial discrimination in the 1974 consent decree, and none was subsequently made by the Court at any time during the life of the consent decree. Defendants have consistently denied, and presently deny, any past or present racial discrimination against black police officers or officer candidates, either arising before, during or after entry of the consent decree.[4] Plaintiffs have offered no proof, other than accusations in the original complaint, of intentional past or present discrimination by the Police Department against black officers or officer applicants occurring prior, during, or after entry of the consent decree.

North State has only referenced, for example, the disparity of black officers on the police force prior to entry of the decree compared to that presented after compliance with it was achieved. Still, North State has yet to offer, and now offers no proof of intentional race discrimination against black officers or applicants at any time. At best, it has demonstrated only statistical disparities between the percentages of black and non-black officers prior to and after entry of the consent decree.

The original consent decree enjoins the Police Department to implement a court supervised affirmative action scheme. Specifically, it requires the Police Department to "develop and implement as needed a plan for actively recruiting qualified black applicants for employment as police officers with the Police Department"[5] focused on achieving the following hiring goals:

(1) In the first year of the decree, for a period commencing on January 1, 1974 until June 30, 1974, "at least fifty percent (50%) of the appointments to vacancies in the rank of

parties have disputed throughout this litigation in favor of one party or the other. Moreover, the fact that the judge who originally heard this action from its inception until entry of the consent decree saw fit not to determine whether actual discrimination had occurred is all the more reason for this Court to refrain from presuming too much. Instead, the Court will rely upon that Judge McMillan's assessment of the facts as they were before him.

The Police contend, "it is obvious that the consent order's essential purpose was to eliminate a manifest racial imbalance then existing in the Police Department." Defendants' Brief in Support of Termination, p. 7, filed June 24, 1994. This brings to mind the Supreme Court's recent discussion of the legal significance of numerical racial imbalances in *Freeman v. Pitts*, —— U.S. ——, ——, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992). The *Freeman* Court said,

Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance *due to the de jure violation* has been remedied, the [Defendant is] under no duty to remedy imbalance that is caused by demographic factors. *Id.* [at ——, 112 S.Ct.] at 1447 (emphasis added).

Bearing in mind this legal standard, and the fact that racial imbalances by themselves have little if any legal significance, it is curious that the Police Department would then liken this case to the purposes of the standard sort of consent decrees mentioned in *U.S. v. City of Miami*, 2 F.3d 1497, 1505–06 (11th Cir.1993) which, "[g]enerally, . . . are intended to eliminate present and future discrimination in employment and sometimes to redress the imbalance caused by past discrimina-

tion." *Id.* at 1505. The Court finds this peculiar because there is nothing in the "four corners" of the instant consent decree, or the record of this case to indicate its purpose was to eliminate or remedy past *de jure* discrimination. Instead, the decree is aimed, on its own unambiguous terms, at attaining—apparently as an end in itself—racial diversity defined by arbitrary statistics.

North State asserts "that the goal of the consent decree, [was] eradicating racial discrimination in hiring and promotion by the Police Department...." This is no more or less than a factually unsupported conclusion which even Judge McMillan refrained from drawing. Certainly, Judge McMillan did not withhold this conclusion lightly. Just as surely, the fact that the Police Department settled the original dispute without admitting race discrimination of any kind contradicts North State's conclusory assessment of the decree's purpose. The Court believes it better to stick to the decree and to take it on its own terms. Those terms are plain and unambiguously focused upon attaining specific statistically defined, racially based, hiring goals; nothing more and nothing less.

4. Commenting upon the instant consent decree, the Fourth Circuit has found, "In the consent order, the City did not acknowledge any racial discrimination in the hiring or promotion of African–American officers and has never acknowledged any racial discrimination in the promotion process for sergeants." *Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207, 210 (4th Cir.1993).

5. Consent Decree, at p. 1 ¶ 2.

Patrolman shall consist of qualified black applicants;" *Id.* at p. 2 ¶ 3.

(2) thereafter "at least forty percent of the appointments to vacancies in the rank of Patrolman shall consist of qualified black applicants until the percentage of black Patrolmen constitutes at least twenty percent (20%) of the total number of Patrolmen employed by the Police Department;" *Id.*

(3) respecting promotions of sergeants, "Effective immediately at least six (6) of the next fifteen (15) promotions to the rank of Sergeant shall consist of qualified black Patrolmen;" *Id.* at ¶ 5.

(4) "[t]hereafter, the percentage of qualified black officers promoted to sergeant during each successive six-month period shall conform as nearly as possible to the percentage that black Patrolmen comprise of all Patrolmen employed by the Police Department at the commencement of each such six-month period, until the percentage of black Sergeants comprises at least twenty percent (20%) of the total number of Sergeants employed by the Police Department." [6] *Id.*

Thus, the consent decree's hiring goals are ultimately aimed at achieving a police force consisting of twenty percent black patrolmen, and twenty percent black sergeants.[7] Con-

versely, the consent decree envisions a police department racially composed of no more than eighty percent non-black patrolmen and no more than eighty percent non-black sergeants. The decree makes no exceptions from these hiring quotas in the event that no qualified black candidates for promotion or employment are available in the relevant work force. Its twenty percent hiring and promotional targets nowhere appear rationally tied to the actual percentage of minorities in the relevant work pool of qualified candidates.

### 2) Compliance with the Decree

At oral argument, North State conceded the Police Department has complied with the consent decree since its entry. The affidavit and testimony of Deputy Police Chief–Administrative Division Norman Boger, who has been responsible for the Police Department's recruiting, hiring, training, and promotion of personnel since 1987, corroborates North State's concession. The Court finds the Department has complied with the decree from its beginning.

### 3) Past Discrimination

As previously mentioned, the Court signing the original consent decree made no fac-

---

**6.** Concerning the promotion of sergeants, the Fourth Circuit has found in a related case that, that "[t]he City concedes that they have met the goal set forth in the consent decree." *Hayes,* 10 F.3d at 211.

**7.** The consent decree also outlines specific "[c]riteria and procedures to be used in determining the qualifications of applicants for employment as Patrolmen...." *Id.* at ¶ 4. Those criteria must not "discriminate against black applicants and are limited to evaluating an applicant's qualifications to be trained as, and to successfully perform the job of, a Patrolman." *Id.* Similar criteria are permitted in evaluating patrolmen for promotion to sergeant. *Id.* at ¶ 6. However, as to applicants for promotion to sergeant, the decree provides,

> [n]o written examination shall be used as part of a procedure for selecting police officers for promotion to Sergeant until the proposed examination, together with the proposed use of its results, shall have been submitted to the Court for review, together with satisfactory evidence that the proposed examination is job related. *Id.*

In an order filed May 4, 1979 amending the original consent decree, this Court examined a proposed promotion examination and found

"satisfactory evidence that the written examination" was job related and should be permitted for use "unless and until the Plaintiffs have shown that the use of the Promotional Examination and its results constitute unlawful racial discrimination." Amended Consent Decree, May 4, 1979 ¶ 1 and ¶ 3. In an order filed July 2, 1990, this Court again approved a proposed updated promotional test finding "satisfactory evidence that the proposed new written Promotional Examination" was job related and permitting its use "unless and until the Plaintiffs have shown that the use of the Promotional Examination and its results constitute unlawful racial discrimination." Amended Consent Decree, July 2, 1990 ¶ 4 and ¶ 6.

Discovery was conducted in connection with this motion at Plaintiffs' request and they have not offered evidence showing either test results in any unlawful racial discrimination. They have hinted at a racially disparate impact resulting from the test. Yet, Plaintiffs' have offered no evidence connecting the test to a racial disparity, as opposed to neutral factors, and particularly have offered no evidence of racially motivated intent behind the tests causing the disparity.

tual finding of intentional, past or present, *de jure* race discrimination when it was entered. Assuming for argument's sake there was intentional, *de jure* race discrimination against black officers and applicants at the time of entry, there is unmistakable evidence which indicates any remnants of those illegal racial preferences against blacks would have been entirely eradicated by the decree. This evidence includes the history of the Police Department's unchallenged compliance with the consent decree, this Court's and the Fourth Circuit's previous finding that the Department engaged in reverse discrimination against non-black sergeant candidates, and its present neutral hiring and promotional policies.

### a) Compliance

The Police Department has either substantially or entirely complied with the terms of the consent decree. At times, the Police Department has actually exceeded the letter of the decree. A review of the latest compliance report, filed by the Police Department on June 23, 1994 and covering 1993, demonstrably illustrates this record of compliance. In 1974, the year the decree was entered, ten percent of all Charlotte Police officers were black. Three years later, in 1977, that percentage all but doubled when it reached nineteen percent. The consent decree's target was to attain a force consisting of twenty percent black officers. In 1978, that goal was exceeded as the percentage of black officers hit twenty three percent. The percentage of black officers consistently hovered above the twenty percent mark by as much as three points every year after 1978 except for 1993 when the statistics showed that seventeen and seven one hundredths percent of all officers were black.[8]

Therefore, the available statistics for fifteen years of the nineteen year lifespan of the order reveal the Department met or exceeded its statistical requirements for hiring black officers. The result has been a one hundred percent increase over the percentage of black officers in 1974, give or take a percentage point, in the number of black patrolmen serving in the Charlotte–Mecklenburg Police Department.

The decree required the promotion of black sergeants to statistically track that of the officers "as nearly as possible ... until the percentage of black Sergeants comprises at least twenty percent of the total number of Sergeants...." Consent Decree at p. 2 ¶ 5. In 1974, nine percent of all sergeants were black. The twenty percent goal was not obtained until 1987 when the percentage of black sergeants reached twenty two percent. The percentages of black sergeants has remained above twenty percent since 1987. It took the Police Department thirteen years to exceed the one hundred fold increase in the percentage of black sergeants that it attained for patrolmen.

Still, it appears to the Court that the percentages intervening 1974 and 1987 were met "as nearly as possible," given the circumstances, to those represented by the patrolman percentages. North State has not challenged this. Unavoidably, the numbers of black officers would first need to grow and be sustained before an adequate pool of qualified black sergeant candidates could be assembled to satisfy the twenty percent target. The Court therefore concludes the Police Department has complied with the consent decree's terms concerning the statistical goals for promoting sergeants.

Respecting the removal of any vestiges of past discrimination, the evidence is compelling. This evidence convinces the Court that assuming there was past *de jure* discrimination against blacks in the Charlotte Police Department in its hiring and promotional practices, its remaining relics have been thoroughly scrubbed out. Any disparity between blacks and whites in the Charlotte Police Department does not now work against black officers and is surely unrelated to any racial animus against blacks. Instead,

---

8. This slight dip in the statistics is attributable to a merger between the Charlotte Police Department and the Mecklenburg County Police Department. Since the Mecklenburg force was not subject to the consent order's quotas, the percentage of black officers was not as high. Thus, once the Mecklenburg force was assimilated, the percentage of black officers was somewhat diluted; although, arguably, the percentage of black officers in the Charlotte Police Department was still in compliance with the order.

the Court concludes any disparity is more likely produced by race neutral factors.

Based upon the evidence before it, the Court finds the Police Department has complied with the spirit and letter of the consent decree relative to the hiring and promotion of black officers and that this compliance has wiped out any remnants of *de jure* past discrimination if they existed at all.

#### 4) Present or Future Discrimination

On cross examination, Deputy Chief Boger testified that of the six officers promoted to sergeant in 1994, none were black. North State did not offer evidence to explain the cause for this phenomenon but contends in its brief opposing termination that "[t]he City continues to utilize a racially discriminatory employment system...." Plaintiffs' Brief Opposing Termination, p. 4. Plaintiff also believes this disparity in promotions is proof that "[t]he employment practices of the department are not yet free of all vestiges of discrimination...." *Id.* This, again, is no more than conclusory conjecture. In *Hayes,* the Fourth Circuit held the Department's racial preferences for blacks utilized in selecting sergeants was unsupported by a compelling state interest and that it "utterly failed to demonstrate that the means it employed, the promotion of officers based on a numerical racial goal, was narrowly tailored to accomplish its asserted purpose of achieving effective law enforcement through diversity." *Hayes,* 10 F.3d at 215–16. That Court noted, "[i]n our view, the City went much further than 'some consideration of race' in this case. Indeed, the City effectively concedes that *the only reason three [black] officers were or [white officers] were not promoted was because of race." Id.* at 216.[9]

If anything, all available evidence indicates the Department in recent history has favored black officers while discriminating against non-black officers.

Confronted with such a resoundingly unfavorable legal evaluation of its racially motivated promotional policies for elevating black sergeants, and having been hit from one side by the consent decree, and the other by the *Hayes* decisions, the Department now represents it is following the path of race neutrality. It is no wonder the City abandoned racial preferences and opted instead for racially neutral practices. Given the evidence presented at the hearing held in this matter, it is also no mystery why the drop off in promotion of black sergeants during the past year has occurred.[10]

Deputy Chief Boger testified on cross examination that if the merit based rankings of qualified applicants for promotion to sergeant were followed, **no black officers would have been promoted up to this time.** He further testified that in 1994, promotions were made exclusively according to merit because of a clarification of law in the *Hayes* opinions. Boger elaborated by saying the Department thought *Hayes* compelled it to abandon race preferences and implement neutral policies. That is, once the Police Department was informed that its racially preferential policy of promoting blacks to sergeant because of their race was unconstitutional, they followed the law and ceased considering race for promotional purposes— consistent with this Court's order upheld by the Fourth Circuit—and returned to a wholly merit based policy. Thus, having abandoned a race preferenced policy for a race neutral one mandated by the Constitution, the effect

---

9. It is true that in *Hayes* the City of Charlotte did not rely upon the consent order as a defense. The Fourth Circuit accordingly viewed the Police Department's promotional practices as "voluntary affirmative action efforts." *Hayes,* 10 F.3d at 213, n. 4. This is entirely compatible with the nature of the decree in this case. It is a consent decree which necessarily carries with it the voluntariness of the City's and the Police Department's consent. Therefore, for present purposes, *Hayes* did evaluate the constitutionality of the consent decree, at least as implemented by Defendants, if not on its face.

10. The Court believes it is attributable to the change in the law intervening the promotions made in 1993 and 1994. In a judgement filed September 1, 1992 in *Hayes v. City of Charlotte and North State Law Enforcement Officers Association,* 802 F.Supp. 1361, this Court ordered the City of Charlotte "not to use racial based criterion for its employment decisions." On appeal in *Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207 (4th Cir.1993), the Fourth Circuit upheld the portion of this Court's order enjoining the use of race-based criteria in the promotion of sergeants.

has been that no blacks were promoted to sergeant in 1994. This hardly demonstrates the Police Department's return to a lurid past of racial bigotry. While there is an undeniable disparity, it can only reasonably be attributable to the Police Department's compliance with the principle of race neutrality mandated by the Equal Protection guarantee of our Constitution, not to the invidious discrimination prohibited by that clause. There appear to be no facts from which Plaintiffs' can infer present or potential invidious race discrimination against black officers.

Again, by way of example, the Deputy Chief Boger testified about the screening questions asked of applicants who want to join the Police Department. *See,* Defendants' Exhibit 5. The questions concern the age of the applicant, any past military or police experience, educational background, and past traffic law violation or other breaches of the law. These questions are wholly race neutral even if, despite the lack of any evidence on the point, they have a racially disparate impact.

Another example is illustrative. Deputy Chief Boger discussed the procedures by which an officer is hired. This procedure, while perhaps tortuously bureaucratic, was completely devoid of any racially biased preferences. Indeed, a black minority recruiter was recently hired by the Police Department and the present composition of the recruitment section of the Department consists of two black sergeants and one black officer out of seven total members.

The mere fact that these neutral criteria, absent the racially biased directives of the consent decree, may result in a racial disparity favoring non-blacks does not demonstrate unlawful discrimination. To the contrary, these facts show nothing more than that the consent decree achieves artificial results which race neutral policies do not.

11. A district court must "begin by determining the basic purpose of the decree" because, "that decree may not be changed 'if the purpose of the litigation as incorporated in the decree have not been fully achieved.'" *United States v. City of*

## LEGAL ANALYSIS AND CONCLUSIONS

■ The Court is presented in this motion with the peculiar anomaly of simultaneously determining that the basic purpose of the instant consent decree has been met,[11] but that, having been achieved, this purpose is nonetheless unconstitutional. Thus, instead of the normal case where full compliance with a consent decree would counsel that its continued existence is no longer remedially necessary, in this case, the decree's terms of compliance themselves also mandate termination because complying with them perpetuates a constitutionally prohibited illegality.

■ The Court concludes the Police Department has met its burden of demonstrating that, "a significant change in circumstances warrants [termination] of the decree." *Rufo,* 502 U.S. at ——, 112 S.Ct. at 760. The Court does so because it finds, as is explained *infra,* that changes in both the factual and legal circumstances merit termination of the consent decree.

### 1) Changed Facts

■ Laying aside the constitutionality of the decree, the Court finds its basic purpose has been achieved and its continued vitality thereby rendered superfluous. Consent decrees born of institutional reform litigation "are not intended to operate in perpetuity." *Dowell,* 498 U.S. at 248, 111 S.Ct. at 637. Racial preferences embodied in those consent decrees "may not take on a life of their own." *Maryland Troopers Ass'n, Inc. v. Evans,* 993 F.2d 1072, 1076 (4th Cir.1993); *see also, Hayes,* 10 F.3d at 216 *quoting, Maryland Troopers.* Thus, even if the law did not mandate termination, the changed factual circumstances would counsel the decree has run its course.

### a) Remedying Past Discrimination

"[T]he proper goals of ... a [consent] decree are to end discrimination and eliminate the effects of past discrimination." *Ensley Miami,* 2 F.3d 1497, 1505 (11th Cir.1993), *quoting, Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 247, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991).

*Branch*, 20 F.3d at 1510.[12] North State has acknowledged that the Police Department's compliance with the decree has been complete. The Court finds the Police Department has entirely complied with the decree and its purpose of achieving specified percentages of black officers has been accomplished. It has, therefore, eradicated any vestiges of past discrimination against black persons by eliminating the racial imbalance existing at the time the decree was entered.[13]

North State argued at the evidentiary hearing that merely meeting the decree goals does not establish discrimination has been eradicated. As true as that statement is, it proves nothing to say it. In fact, this Court has found the Police Department was in recent history culpable for race discrimination.[14] Of course, the discrimination at issue in *Hayes* was against non-black officers. Suppose the Police Department is simultaneously engaging in the seemingly mutually exclusive scenarios of North State's assumed lingering racism against blacks and the Court's finding in *Hayes* of race discrimination against whites.

If both are simultaneously occurring, one thing could confidently be said: The Charlotte Police Department would be utterly indiscriminate in its race discrimination. It would be displaying bigotry never before matched and very much to the benefit of those non-black, non-white, inhabitants of the Department. But the Court is unaware of a surge in the percentages of, for example, Hispanic or Asian police officers in Charlotte. Were the *Hayes* and North State scenarios simultaneously true, Charlotte's Police Department would be a discriminator against most everybody on its force; white and black alike. This, of course, would be an absurd conclusion since discrimination, by definition, requires that someone, rather than everyone, bear the brunt of an arbitrary distinction between those who are otherwise equals. The Police Department cannot discriminate against everyone it hires and still have employees against whom it has been or is now an invidious discriminator.

The Court finds no vestiges of discrimination in the current Department detrimental to blacks. "The vestiges of segregation that are the concern of the law ... may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." *Freeman v. Pitts*, — U.S. —, —, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992). The only remainder of any former discriminatory ways harbored in the Police Department known to this Court were not subtle but overt. They also did not work against black officers. The Court finds on the facts presented in this motion, and the recent history of the Police Department's employment practices, that any lingering effects of past discrimination adverse to blacks have been rooted out of the Charlotte Police Department.

**12.** *See also, City of Miami*, 2 F.3d at 1505. "Generally, the remedies in employment discrimination consent decrees are intended to eliminate present and future discrimination in employment and sometimes to redress the imbalance caused by past discrimination." *Id.*

**13.** Always problematic in evaluating the successfulness of a project in eradicating vestiges is determining with any precision how, exactly, one knows a "remnant" when he sees it or how one detects a "vestige." As Justice Scalia has put it, "[w]e have never sought to describe how one identifies a condition as the effluent of a violation, or how a 'vestige' or a 'remnant' of past discrimination is to be recognized. Indeed, we have not even betrayed an awareness that these tasks are considerably more difficult than calculating the amount of taxes unconstitutionally paid." *Freeman*, — U.S. at —, 112 S.Ct. at 1451 (Scalia, J. concurring). Of course, the problem of determining whether a vestige has been eradicated is compounded by the difficulty in finding the vestige in the first place. Apparently, this problem has also afflicted North State since, as best the Court can tell, it has offered no facts, other than innuendo, to doubt the Police Department's proof that there remain no uneradicated vestiges in the Charlotte–Mecklenburg Police Department.

**14.** *See, Hayes v. City of Charlotte*, 802 F.Supp. 1361 (W.D.N.C.1992).

The City has a promotion process which has not been challenged by any minority group. Now, it is not following the process, but has gone off on a mission to achieve an integrated supervisory force consisting of what it perceives to be an appropriate percentage of minorities. The City is trying to accomplish this goal by, in effect, eliminating from consideration for promotion 90% of the eligible white officers or, in more precise terms, by discriminating against white officers. *Id.* at 1369.

## b) Preventing Present and Future Discrimination

The only remaining reasons for maintaining the decree as it presently stands is to either remedy present or prevent future race discrimination against black officers and applicants. No evidence has been presented which leads the Court to conclude the Police Department presently discriminates against black persons because of their race. Thus, there is no evidence to counterbalance Deputy Chief Boger's believable testimony that he is unaware of any race discrimination presently inhabiting the policies of the Department and that in his opinion, the Police Department does not now discriminate against its officers because of their race.

Of course, "[a] district court need not accept at face value the profession of a [defendant] which has intentionally discriminated that it will cease to do so in the future. But in deciding whether to ... dissolve a ... decree, a [defendant's] compliance with previous court orders is obviously relevant." *Dowell*, 498 U.S. at 249, 111 S.Ct. at 637. Notwithstanding the absence of any proof of intentional discrimination by the Police Department, the Court has not merely taken Deputy Chief Boger's word that the Department no longer discriminates against blacks.

North State contended at oral argument that this Court should maintain supervision of the Police Department until it is shown that absent the decree, race will be no factor in the Department's employment practices. If anything sufficiently demonstrated the Department's commitment to race neutrality, it was North State's cross examination of Deputy Chief Boger.

When asked why no black officers were promoted in 1994, Boger testified because the law, and particularly *Hayes*, compelled the Department to pursue race neutral employment policies and that there were no plans to do otherwise. Caught between the rock of the instant decree and the hard place of *Hayes*, there can be little doubt that the Department has found race discrimination either against blacks or whites does not pay. Counsel for North State sought to highlight certain disparities in the percentages of blacks who pass the examination given to applicants for promotion to sergeant. This proves nothing relevant under the law because, even if it is true, the cause is still left to rank speculation. A disproportionate impact in the test results alone would not go far toward showing discrimination motivated by race. Statistics alone simply are not enough to mandate continued adherence to the decree.

As previously mentioned, "compliance with previous court orders is obviously relevant." *Dowell*, 498 U.S. at 249, 111 S.Ct. at 637. In this case, the Department has an unquestioned record of complete compliance with the orders of this Court. Indeed, the Department has manifested its resolve to follow the law no matter how often it seems to tug it in conflicting directions. If anything can be said at all, it is that the Police Department has demonstrated its commitment in this case to the rule of law as applied to it. The Court finds the employment practices of the Police Department now comply with the law because they are race neutral.

Based further upon the demonstrated lawfulness of the Police Department's past compliance with the consent decree, this Court's order in *Hayes*, and the mandate of the Fourth Circuit in *Hayes*, the Court has no credible reason to believe the Police Department will violate the law by intentionally engaging in unlawful race discrimination against police officers or applicants in the future. It has complied with this Court's and the Fourth Circuit's mandate of race neutral employment practices while striving mightily to also comply with the instant consent decree. The City's past record, the Court believes, is the strongest indicator of its likely behavior in the future. That record is one of obedience to the law which the Court justifiably anticipates will continue into the future. Therefore, the Court concludes the Police Department has also satisfied its burden of demonstrating it is not now conducting, and will not likely revert to racially discriminatory employment practices. Also for the above stated reasons, and those to be outlined below, the Court finds continuation of the decree, "without [termination] would be detrimental to the public interest." *Rufo*, 502 U.S. at ——, 112 S.Ct. at 760.

## 2) Changed Law

■■■■ "A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Id.* at ——, 112 S.Ct. at 762. It is now settled that an employment discrimination consent decree entered by a federal judge like that presented in this case "should be treated as a 'voluntary affirmative action plan for purposes of equal protection analysis.'" *Ensley Branch,* 20 F.3d at 1505 (citation omitted). Equally clear is the principle that these voluntary affirmative action plans "are subject to strict scrutiny" analysis mandated by *City of Richmond v. J.A. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).[15]

■■■■ This is the view, at least, in the Fourth Circuit.[16] In *Maryland Troopers Ass'n v. Evans,* 993 F.2d at 1076–1079, the Fourth Circuit subjected a consent decree entered by a federal district court between the Coalition of Black Maryland State Troopers and the Maryland State Police to the strict scrutiny, equal protection review mandated by *Croson.* Consequently, since "strict scrutiny must be applied to *all* governmental classification by race, whether or not its asserted purpose is 'remedial' or 'benign,'" the consent decree in this case must be subjected to strict scrutiny analysis under either the Fourteenth Amendment's equal protection guarantee or the equal protection component of the Fifth Amendment's Due Process clause. *Croson,* 488 U.S. at 520, 109 S.Ct. at 735–36 (Scalia, J. concurring) (emphasis added).[17] The Court holds for the following reasons that the instant consent decree, when scrutinized strictly under equal protection doctrine, is unconstitutional.[18]

Even when the state believes its intentions are pure, it must be remembered that, "[o]f all the criteria by which men and women can be judged, the most pernicious is that of race. The injustice of judging human beings by the color of their skin is so apparent that racial classifications cannot be rationalized by

---

**15.** *See also, Detroit Police Officers Ass'n v. Young,* 989 F.2d 225, 227 (1993) (Sixth Circuit applying *Croson* to consent decree entered by United States District Court for the Eastern District of Michigan).

**16.** This view, which the Court finds cogent, is also in accord with that of Justices O'Connor, Rehnquist, Scalia and Kennedy. "'Strict scrutiny' requires that, to be upheld, racial classifications must be determined to be necessary and narrowly tailored to achieve a compelling state interest." *Metro Broadcasting, Inc. v. F.C.C.,* 497 U.S. 547, 603, 110 S.Ct. 2997, 3029, 111 L.Ed.2d 445 (1990) (O'Connor, Rehnquist, Kennedy and Scalia, JJ. dissenting). "Strict scrutiny is the surest test the Court has yet devised for holding true to the constitutional command of racial equality." *Id.* at 634, 110 S.Ct. at 3045 (Kennedy and Scalia, JJ. dissenting).

**17.** Despite the fact that the "Fifth Amendment ... does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states" the Supreme Court has announced "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), *see also, Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 574 n. 3, 42 L.Ed.2d 610 (1975). Consequently, the Court has said "discrimination may be so unjustified as to be violative of due process" because it has found it "unthinkable that the same Constitution would impose a lesser duty on the Federal Government" than it does on the states by virtue of the Fourteenth Amendment. *Bolling,* 347 U.S. at 499–500, 74 S.Ct. at 694–95.

State action is present under the Fourteenth Amendment by virtue of the participation of the Charlotte Police Department, an agent of the government, in the instant decree. Additionally, there can now be no doubt that federal courts are in certain circumstances state actors for constitutional purposes. "[T]he injury caused by the discrimination [backed by sanction of court authority] is made more severe because the government permits it to occur within [its supervision]. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality." *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 628, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991).

**18.** The Court notes that the instant decree was entered by Judge McMillan without the benefit of the intervening twenty years of case law refining equal protection doctrine. Thus, a finding by this Court that the instant decree violates what is now settled equal protection doctrine does not impugn Judge McMillan's mastery of the law as it stood at the time or his judgment in applying it so much as it points out that this Court has the benefit of hindsight which is sometimes even better than twenty-twenty.

the casual invocation of benign remedial aims." *Evans,* 993 F.2d at 1076. In an attempt to remedy the wrongs of the past, courts have at times mandated racial balancing for its own sake as though that were a principle championed by our Constitution. But racial balancing is not a constitutional principle; in fact our Constitution prohibits favoring persons because of the accident of their ancestry. "Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation." *Freeman,* — U.S. at —, 112 S.Ct. at 1447. Because skin color arises from genetic makeup rather than our talents or character, it has been said that "discrimination on the basis of race is illegal, immoral, unconstitutional, and destructive of democratic society." A. Bickel, The Morality of Consent 133 (1975). For these reasons, "our constitutional premise is that race is an impermissible arbiter of human fortunes." *Evans,* 993 F.2d at 1076.

■ In *Croson,* the Supreme Court held that race based affirmative action classifications must be justified by a compelling state interest and narrowly tailored to achieve that weighty end.[19] The Constitution's equal protection guarantees, as *Croson* makes clear, subject "voluntary, race-conscious, local government affirmative action programs ... to strict scrutiny" review. *Ensley Branch,* 20 F.3d at 1504. *Croson* involves a "two step analysis for evaluating a race-conscious remedy.... First, the state must have a 'strong basis in evidence for its conclusion that remedial action [is] necessary.'" *Evans,* 993 F.2d at 1076, *citing, Croson,* 488 U.S. at 500, 109 S.Ct. at 724, *quoting, Wygant v. Jackson Board of Education,* 476 U.S. 267, 277, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986). Finding this "strong basis in evidence" involves "searching judicial inquiry into the justification for such race-based measures ..." *Croson,* 488· U.S. at 493, 109 S.Ct. at 721. The purpose of this "searching judicial inquiry" *id.* is "to 'smoke out' illegitimate uses of race by assuring that the [government] is pursuing a goal important enough to

warrant use of a highly suspect tool." *Id.* To demonstrate a compelling state interest, there must be more than "a general history of societal discrimination; the state must specify the racial discrimination that it is targeting with its plan." *Evans,* 993 F.2d at 1076, *citing, Croson,* 488 U.S. at 498–99, 109 S.Ct. at 723–24; *Wygant,* 476 U.S. at 274–76, 106 S.Ct. at 1847–48.

■ This specifically identified compelling state interest must be obtained by a narrowly tailored remedial measure. That is, "the state must 'narrowly tailor' any preferences based on race to meet their remedial goal." *Id., citing, Croson,* 488 U.S. at 507, 109 S.Ct. at 728; *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847. Narrowly tailored remedies are those "necessary to remedy the discrimination at which they are aimed...." *Id., citing, United States v. Paradise,* 480 U.S. 149, 178–79, 107 S.Ct. 1053, 1070, 94 L.Ed.2d 203 (1987). Thus, a remedy must not be "overinclusive" *Croson,* 488 U.S. at 506, 109 S.Ct. at 728, but instead confined to alleviate "the effects of identified discrimination ..." within the institution subject to the remedy. *Id.* 488 U.S. at 508–10, 109 S.Ct. at 729. When the remedy takes the form of numerical goals or quotas, they

> must be waivable if qualified minority applicants are scarce, and such goals must bear a reasonable relationship to minority percentages in the relevant qualified labor pool, not in the population as a whole. Finally, the preferences may not supplant race-neutral alternatives for remedying the same discrimination. *Evans,* 993 F.2d at 1076–77 (citations omitted).

### 3) *Compelling State Interest*

A charitable reading of the consent decree might allow a finding that it, at best, is premised upon remedying societal discrimination against blacks generally. A more realistic reading supports the conclusion that the race quotas embodied in the decree are merely ends in themselves. No reading of

---

**19.** Justices Marshall, Brennan, and Blackmun recognized this when, in their dissent they proclaimed "[t]oday, for the first time, a majority of this Court has adopted strict scrutiny as its standard of Equal Protection Clause review of race-conscious remedial measures." *Croson,* 488 U.S. at 551, 109 S.Ct. at 752.

the decree allows a finding that it is founded upon any interest approaching the level of compellingness. *Croson* acknowledges "evidence presented ... [which] identified discrimination in the Richmond construction industry" would suffice for a compelling state interest. *Croson,* 488 U.S. at 505, 109 S.Ct. at 728.

Here, there has been neither proof nor a judicial finding of past discrimination prior to 1974 (or for that matter since) within the Charlotte Police Department to support the decree's race-conscious remedy. Of course Charlotte, like any other city in the Union, is inhabited by assorted minorities with a history of past societal discrimination ranging from the offspring of Irish immigrants to the descendants of black slaves, and the innumerable variations of racial composition in between.[20] However, this is not enough to constitutionally impose race preferences.

> To accept [a] claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group. The dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs. [This] would be contrary to both the letter and spirit of a constitutional provision whose central command is equality. *Id.,* at 505, 109 S.Ct. at 728.

In *Evans,* the Fourth Circuit found the consent decree before it "contain[ed] not one determination that the MSP has racially discriminated in hiring or promoting black troopers." *Evans,* 993 F.2d at 1077. North State has intimated, but offered no proof, that disparities in test scores of applicants for promotion to sergeant indicate remnants of an intransigently racist police department.

Yet, even if there were statistical facts to support these suspicions "[t]his method of proof has serious deficiencies. Inferring past discrimination from statistics alone assumes the most dubious of conclusions: that the true measure of racial equality is always to be found in numeric proportionality. The Fourteenth Amendment does not embody that view." *Evans,* 993 F.2d at 1077. Bare statistics are the very best North State can do and it has not presented that sort of proof well. Certainly, there is no anecdotal evidence to bolster the raw numbers.

Moreover, apart from the fact that North State is now hinting at a statistical imbalance which suggests present discrimination, there is no indication that Judge McMillan relied upon that evidence or any evidence of race discrimination when he entered the decree. "A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the conditions exists." *Croson,* 488 U.S. at 500–01, 109 S.Ct. at 725. Therefore, the Court concludes the consent decree lacks any interest that is compelling to justify its racial preference for blacks.

### 4) Narrow Tailoring

Here, as in *Croson,* "it is almost impossible to assess whether the [decree] is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way." *Id.* 488 U.S. at 507, 109 S.Ct. at 729. Even if the decree were supported by some overriding state interest, its remedies are at best loosely fitted to their end. For example, the decree mandates racially preferential hiring of blacks "until the percentage of black Patrolmen constitutes at least twenty percent (20%) of the total number of Patrolmen...." Consent Decree p. 2 ¶ 3, January 9, 1974. Identical targets are set for the ranks of sergeant. Why twenty percent? What relationship this number has to any

---

**20.** As aptly demonstrated by Mr. Justice Scalia, The struggle for racial justice has been a struggle by the national society against oppression in the individual States. What the record shows, in other words, is that racial discrimination against any group finds a more ready expression at the state and local level. [I]n Richmond ... the enactment of a set-aside clearly and directly [is] beneficial to the dominant political group, which happens also to be the dominant racial group. The same has no doubt happened before in other cities ...—and blacks have often been on the receiving end of the injustice. Where injustice is the game, however, turnabout is not fair play. *Croson,* 488 U.S. at 524, 109 S.Ct. at 738 (citations omitted).

identifiable remedial purpose is a mystery on the face of the decree. There is no factual reason to believe that twenty percent, or a even a rough approximation of that number, of applicants to the police department prior to 1974 were black or even that twenty percent of the pertinent work group at that time contained enough qualified black people, who also wanted to be police officers or sergeants, to satisfy the twenty percent bottom line. In other words, if past discrimination were the remedial end of this decree, the twenty percent bull's-eye does not appear to be grounded in anything factually related to the relevant work force. Twenty percent is but a number plucked out of the sky. It cannot be factually said that it is tied to a percentage representative of the actual number of black victims of past race discrimination. The twenty percent targets "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing." *Id.*, 488 U.S. at 507, 109 S.Ct. at 729.

Moreover, these quotas are rigid. The decree places the Department in the predicament of potentially having less than the number of qualified black applicants necessary to fill twenty percent of its ranks and thus being unable to satisfy the decree's command for reasons entirely outside of its control. Although the decree does provide for a means to modify its terms, this is much too rigid and is hardly authorization for a waiver. A modifiable mandate is not the same as one that is waivable. The twenty percent racial quotas are unbending, unforgiving, and sledgehammer hard.

Moreover, the decree absolutely prohibits non-blacks from holding more than eighty percent of the available positions. Suppose black applicants, for their own reasons or for demographic reasons, are unavailable to meet the bottom-line twenty percent quota. An Asian who wants to be a policeman and is qualified would be precluded from being an officer or sergeant if the available eighty percent non-black slots were filled by non-blacks of assorted racial composition. If the Asian aspirant cannot fit within the remaining eighty percent; too bad for him under this decree. The twenty percent hiring and promotional targets are simply too rigid and

arbitrary to satisfy the narrow tailoring requirement of the constitution.

It is impossible to tell whether the twenty percent goals are reasonably related to the percentage of qualified blacks in the relevant labor pool because there are no factual findings that the Court even knew what those percentages were. Thus, it appears at least as likely as not that the decree was doling out preferences to persons who were either unqualified or at a rate disproportionally related to any relevant labor pool. It is virtually certain that sergeant candidates "Nos. 29, 62, and 74" were unqualified for promotion to sergeant since the Chief of Police admitted they "would probably not have been promoted had they not been black." *Hayes v. City of Charlotte*, 802 F.Supp. at 1372. That is, the only qualification which lofted these candidates over the hurdle was their skin color. Thus, the Court is left with this conclusion; the apparent goal of the consent decree is "outright racial balancing. It rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Croson*, 488 U.S. at 507, 109 S.Ct. at 729.

Finally, there is no indication within the decree or the record now before the Court that any consideration was given to race neutral remedies before the decree was entered. Instead of a last resort, the decree appears to have favored racial quotas as a first resort. The Court could have, for example, taken claims of race discrimination at the Police Department on a case by case basis. Admittedly, this is more procedurally demanding. But deliberation is not without its benefits in achieving justice. Instead, the Court believes it more plausible that the Court's,

> only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the

**1460**

bias of a suspect classification. *Croson,* 488 U.S. at 508, 109 S.Ct. at 729.

Accordingly, the Court holds the consent decree is violative of the equal protection principles mandated in both the Fifth and Fourteenth Amendments. Therefore, because the decree is unconstitutional, it is both "detrimental to the public interest" and "impermissible under federal law" and must be terminated. *Rufo,* 502 U.S. at —— and ——, 112 S.Ct. at 760 and 762. Thus, because the lowered constitutional ceiling mandates termination of this decree, the Court concludes termination is the only suitably tailored option available under these facts and the law.

To summarize, the Court holds that the Charlotte–Mecklenburg Police Department has entirely satisfied the commands of the consent decree and has met its burden of demonstrating changed factual circumstances sufficient to warrant termination of the decree. The Court also holds that even if the Department had not done so, it has demonstrated its burden of showing the decree violates the equal protection guarantees of the Fifth and Fourteenth Amendments. Therefore, the Court must grant the Police Department's motion to terminate the consent decree, including all its subsequent amendments, entered by this Court on January 9, 1974.

**NOW, THEREFORE, IT IS ORDERED** that Defendants' motion to terminate the consent decree be, and hereby is, **GRANTED.** This case is now closed.