993 F.2d 1072
 61 Fair Empl.Prac.Cas. (BNA) 1177,
61 Empl. Prac. Dec. P 42,235, 61 USLW 2732
 MARYLAND TROOPERS ASSOCIATION, INCORPORATED, Appellant,
The Coalition of Black Maryland State Troopers,
Incorporated; Rufus L. Caple, Corporal; Mark A. Caple;
Johnny Fortune, Corporal; James F. Harris, TFC; Floyd C.
Jones, Corporal; Ronald M. Murphy, Corporal; Dewight D.
Rolley, TFC; George A. Taylor, TFC; Frazier A. West, TFC,
Plaintiffs-Appellees,
v.
Edward M. EVANS, Deputy Superintendent Maryland State
Police; Frank Mazone, Deputy Superintendent Maryland State
Police; Henry A. Cumberland, Maryland State Police;
William T. Gerwig, Maryland State Police; Thomas S. Bosley,
Captain; Robert D. Graham, Maryland State Police; Raymond
D. Cotton, Maryland State Police; George C. Wyatt, Maryland
State Police; William Donald Schaefer, as Governor of the
State of Maryland; Bishop L. Robinson, as Secretary of the
Maryland Department of Public Safety & Correctional
Services; Hilda E. Ford, as Secretary of the Maryland
Department of Personnel; Larry W. Tolliver, Colonel, as
Superintendent of the Maryland State Police, Defendants-Appellees.
 No. 92-2171.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 1, 1993.
Decided May 6, 1993.
 
 Andrew C. Topping, Hogan & Hartson, Baltimore, MD, argued (Gil A. Abramson, on brief) for appellant.
 Lawrence P. Fletcher-Hill, Asst. Atty. Gen., Baltimore, MD, argued (J. Joseph Curran, Jr., Atty. Gen. of MD, Millicent Edwards Gordon, Asst. Atty. Gen., David L. Moore, on brief), for appellees.
 Before WILKINSON, Circuit Judge, POTTER, United States District Judge for the Western District of North Carolina, sitting by designation, and HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case presents the question of what evidentiary foundation is required for a state to adopt a plan with numerical employment goals based upon race. The Maryland Troopers Association has intervened to challenge a Consent Decree between the Coalition of Black Maryland State Troopers and the Maryland State Police, under which the MSP agreed to hire and promote certain percentages of black troopers at each state trooper rank. The MTA contends that these numerical goals violate the Equal Protection Clause of the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964. Appellees respond that the goals are justified by statistical disparities between minority percentages in the MSP and minority percentages among Maryland residents who are minimally qualified to be MSP troopers. We think that bare statistical comparisons constitute a treacherous rationale for the installation of race preferences, and that the comparisons adduced in this case fall far short of justifying a state-imposed, race-conscious remedy. Accordingly, we reverse the judgment of the district court and remand this case with instructions that the MTA's objections to the hiring and promotional goals in the Consent Decree be granted.
 
 I.
 
 2
 The story behind this dispute began in 1974, when the United States sued the State of Maryland for racial discrimination in hiring state troopers. The United States and Maryland settled this litigation by entering into a consent decree, under which the Maryland State Police agreed to hire black applicants at such a rate as to achieve an overall percentage of 16% black troopers in five years. In 1979, the consent decree was modified. The overall goal was lowered to 14% black troopers, but the MSP was additionally required to have 33% of its entry-level troopers be black.
 
 
 3
 By 1980, 9.5% of the MSP troopers were black. They were concentrated in the lower ranks, however, largely because the MSP does not hire laterally and promotes troopers no more than one rank per year. In 1982, reports of cronyism and rigged examinations surfaced in the MSP's promotional system. These circumstances led the Attorney General of Maryland in 1985 to issue a critical Report on Promotional Practices in the Maryland State Police. Part I of the AG's Report documented the continuing allegations that high-ranking MSP officers were tampering with promotional scores to favor their chosen candidates, and concluded that MSP efforts to address this problem had been inadequate. Part II charted the low representation of blacks in the upper ranks of the MSP, and suggested that the flawed promotional system was the culprit. The Report noted favorably the recommendation of an earlier study that the MSP thoroughly overhaul its promotional system in order to be fair to troopers of all races.
 
 
 4
 In response to the Report, the Superintendent of the MSP adopted an Affirmative Action Promotional Plan for Law Enforcement Personnel, which set out specific numerical goals for the composition of black troopers in the lower ranks of the MSP. This Plan became effective on March 27, 1985, and was to expire once the MSP established a nonbiased promotional scheme. Toward this latter end, the MSP hired an outside consulting firm to develop and administer a promotional evaluation for the ranks of Corporal through Captain. By 1988, the consulting firm had installed new examinations for the ranks of Corporal, Sergeant, and First Sergeant, as well as more elaborate "assessment centers" for the ranks above. As required by Maryland law, however, the Superintendent of the MSP retained ultimate discretion over whom to promote, and was able to consider a number of factors in addition to the exam scores, including recommendations from immediate supervisors, special experience of the candidate, where the candidate wanted to work, and input from bureau chiefs.
 
 
 5
 Between 1980 and 1991, the overall percentage of black MSP troopers steadily increased. The following chart is illustrative:
 
 
 6
 Table 1: Percentages of Black Troopers (1980"91)
 
 
 7
 Rank 1980 1985 1988 1991
Trpr 29.6% 31.3% 22.5% 24.9%
TFC[1] 8.2% 15.3% 16.7% 17.5%
Crpl 3.9% 8.7% 12.0% 16.3%
Sgt 1.8% 5.4% 7.6% 10.9%
1st Sgt " 5.4% 8.1% 9.6%
2d Lt " 4.8% 9.4% "
1st Lt " " 2.6% 14.9%
Capt 5.3% " " 6.9%
Maj " " " "
Lt Col " " " "
Overall 9.5% 13.7% 14.9% 17.1%
 
 
 8
 Moreover, after 1988, when the MSP installed the new promotional examination, black troopers were promoted at rates that actually exceeded the percentage of blacks in the eligible rank below. In 1989, of the 81 troopers promoted from Trooper First Class to Corporal, 19 (or 23.5%) were black; of the 42 promoted from Corporal to Sergeant, 9 (or 21.4%) were black; and of the 5 promoted from Sergeant to First Sergeant, 1 was black. In 1990, 20% of all the promotions in all the ranks went to black troopers.
 
 
 9
 Meanwhile, on June 19, 1985, the Coalition of Black Maryland State Troopers sued the MSP in the United States District Court for Maryland, alleging ongoing racial discrimination by the MSP in hiring and promoting troopers. In December 1990, the Coalition and the MSP settled this lawsuit by entering into the Consent Decree that is the subject of this appeal. The Consent Decree required the MSP to meet the following numerical goals by rank, until the MSP met the overall goal of 22%:
 
 Table 2: Goals in 1990 Consent Decree
 
 10
 Rank Pct. Black
Trpr 25% immediately
TFC 22% by end of fifth year
Crpl 22% by end of fourth year
Sgt 22% by end of fourth year
1st Sgt 22% by end of fourth year
Lt 20% by end of fourth year
Capt 15% by end of fourth year
Maj one position by end of fifth year
Lt Col one position by end of seventh year
Overall 22%
 
 
 11
 The Consent Decree did not require the MSP to hire or promote anyone who was not otherwise qualified. The Decree also included provisions other than the hiring and promotional goals: monetary damages and automatic promotions for individual plaintiffs; equal access for employee organizations; requirements of equality in training, job and equipment assignments, and disciplinary proceedings; and so forth.
 
 
 12
 On January 11, 1991, the Maryland Troopers Association intervened to oppose the hiring and promotional goals in the Consent Decree. On August 11, 1992, the district court rejected the MTA's challenge, ruling that the evidence of racial discrimination offered by the Coalition and the MSP was sufficient to warrant a race-conscious remedy. This evidence took two basic forms: (1) the findings in the 1985 Attorney General's Report; and (2) a pair of statistical comparisons between the black composition of the MSP and the black composition of the relevant qualified labor pool.
 
 
 13
 The first of these statistical comparisons was between the percentage of blacks in each rank of the MSP in 1985 (see Table 1), and the percentage of black Maryland residents who worked in jobs that allegedly required equivalent skills:
 
 
 14
 Table 3: Percentages of Blacks in Equivalent Jobs
 
 
 15
 Rank (1985) Pct. Equivalent Job (1980 Census Data) Pct.
Crpl 8.7% Police & Detectives 19.4%
Sgt 5.4% Police Supervisors 10.7%
1st Sgt 5.4% Police Supervisors 10.7%
2d Lt 4.8% Salaried Managers 10.2%
1st Lt " Salaried Managers 10.2%
Capt " Salaried Managers 10.2%
Maj " Protective Services Administrators 11.4%
Lt Col " Protective Services Administrators 11.4%
 
 
 16
 The "equivalent job" in Table 3 represents a job for which census data was available, and whose duties the Coalition and the MSP deemed most similar to those of the corresponding MSP rank.
 
 
 17
 The second statistical comparison was between the overall percentage of blacks in the MSP and the percentage of blacks who met the basic criteria to be a MSP trooper--i.e., Maryland residents between 20 and 58 years old with high school degrees.[2] According to 1980 census data, 18.8% of Maryland high school graduates between the ages of 21 and 59 were black; between 21 and 29 years old, 22.2% were black. Since the MSP hired mostly younger applicants, the district court permitted the parties to use 22% as a baseline figure against which "to assess underrepresentativeness" in all ranks of the MSP. Comparing 22% to the figures in Table 1, the district court inferred "that black officers ha[d] been the victims of past discrimination in promotions."
 
 
 18
 Having found racial discrimination by reference to the 22% baseline, the district court ruled finally that the 22% figure also supported the specific numerical goals set out in the Consent Decree. See Table 2. Accordingly, the court ordered the adoption of the Decree. The MTA appealed.
 
 II.
 
 19
 "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." Wygant v. Jackson Board of Education, 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986) (plurality opinion) (quoting Regents of the University of California v. Bakke, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (Powell, J.)). The rationale for this stringent standard of review is plain. Of all the criteria by which men and women can be judged, the most pernicious is that of race. The injustice of judging human beings by the color of their skin is so apparent that racial classifications cannot be rationalized by the casual invocation of benign remedial aims. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 500, 109 S.Ct. 706, 724, 102 L.Ed.2d 854 (1989). While the inequities and indignities visited by past discrimination are undeniable, the use of race as a reparational device risks perpetuating the very race-consciousness such a remedy purports to overcome. State-sponsored racial criteria in particular may sacrifice the indivisible character of American citizenship. It thus remains our constitutional premise that race is an impermissible arbiter of human fortunes. The Fourteenth Amendment forbids the states to classify men and women on the basis of race, except as a last-resort remedy for well-defined instances of racial discrimination.
 
 
 20
 The two-step analysis for evaluating a race-conscious remedy implements this constitutional premise. First, the state must have a "strong basis in evidence for its conclusion that remedial action [is] necessary." Croson, 488 U.S. at 500, 109 S.Ct. at 724 (quoting Wygant, 476 U.S. at 277, 106 S.Ct. at 1848 (plurality opinion)). All too easily, invidious racial preferences can wear the mask of remedial measures--a risk that only magnifies as the governmental body gets smaller and more susceptible to interest-group capture. See Croson, 488 U.S. at 495-96, 109 S.Ct. at 721-22 (O'Connor, J.); id. at 522-24, 109 S.Ct. at 736-37 (Scalia, J., concurring). Courts thus bear an especial obligation to scrutinize the asserted bases for race-conscious relief. "Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." Croson, 488 U.S. at 493, 109 S.Ct. at 721 (O'Connor, J.). Hence the state must present more than a general history of societal discrimination; the state must specify the racial discrimination that it is targeting with its plan. Id. at 498-99, 109 S.Ct. at 723-24; see also Wygant, 476 U.S. at 274-76, 106 S.Ct. at 1847-48 (plurality opinion).
 
 
 21
 Second, the state must "narrowly tailor" any preferences based on race to meet their remedial goal. Croson, 488 U.S. at 507, 109 S.Ct. at 728; Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion). The preferences may remain in effect only so long as necessary to remedy the discrimination at which they are aimed; they may not take on a life of their own. United States v. Paradise, 480 U.S. 149, 178-79, 107 S.Ct. 1053, 1070, 94 L.Ed.2d 203 (1987) (plurality opinion). The numerical goals must be waivable if qualified minority applicants are scarce, id. at 177, 107 S.Ct. at 1069 (plurality opinion), and such goals must bear a reasonable relation to minority percentages in the relevant qualified labor pool, not in the population as a whole. Id. at 179-82, 107 S.Ct. at 1070-72 (plurality opinion). Finally, the preferences may not supplant race-neutral alternatives for remedying the same discrimination. Croson, 488 U.S. at 507, 109 S.Ct. at 728; Paradise, 480 U.S. at 171-77, 107 S.Ct. at 1066-69 (plurality opinion).
 
 III.
 
 22
 Judged against this standard, the provisions for race-conscious relief in the Consent Decree are invalid. We need not consider whether the parties have "narrowly tailored" these provisions to meet the remedial goal, because the parties do not have the requisite "strong basis in evidence" to warrant a race-conscious remedy in the first place.
 
 
 23
 The evidence of recent racial discrimination by the MSP is problematic at best. The Parties' Proposed Findings of Fact, which the district court adopted, contain not one determination that the MSP has racially discriminated in hiring or promoting black troopers. The parties do refer to the findings in the 1985 Attorney General's Report, but at most these findings were of cronyism in the MSP--not of racism. We have never suggested that cronyism translates neatly into racial discrimination for purposes of Title VII, see Holder v. City of Raleigh, 867 F.2d 823 (4th Cir.1989), nor that evidence of cronyism, apart from any racial animus, would justify the explicit racial preferences employed in this Consent Decree. Rigging scores for one's friends is plainly no way to run a police department; nonetheless it is not the same kind of iniquity as racial discrimination. See id. at 826-27. It is in this respect that the AG's Report falls short. The 1985 Report contained but three sentences alluding to complaints of actual racial discrimination and harassment in the MSP. The Report neither substantiated nor repudiated these complaints, and concluded simply that the MSP promotional system suffered from the "perception" of being discriminatory. See Croson, 488 U.S. at 500, 109 S.Ct. at 724 (conclusory statements that there was racial discrimination in the construction industry were "of little probative value in establishing identified discrimination").
 
 
 24
 The main evidence that the parties present to justify the institution of race preferences is statistical: (1) the comparison between the percentage of Maryland residents with high school degrees who are black and the percentage of blacks in the MSP; and (2) the comparison between the percentage of black troopers in each rank of the MSP and the percentage of blacks in what were deemed to be the equivalent census job categories. This method of proof has serious deficiencies. Inferring past discrimination from statistics alone assumes the most dubious of conclusions: that the true measure of racial equality is always to be found in numeric proportionality. The Fourteenth Amendment does not embody that view. See Croson, 488 U.S. at 507, 109 S.Ct. at 728 (rejecting "the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population") (quotations omitted). There is no reason here, for example, to assume that well-qualified minority applicants prefer police work to the spectrum of other public and private employment opportunities available to them. Thus, only when there are "gross statistical disparities" between the racial composition of the employer's workforce and the racial composition of the relevant qualified labor pool may a court infer that the employer has racially discriminated. Croson, 488 U.S. at 501, 109 S.Ct. at 725 (quoting Hazelwood School District v. United States, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)). And even then, when the Supreme Court has approved a race-conscious remedy on the basis of such comparisons, the statistics have been corroborated by significant anecdotal evidence of racial discrimination. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 338, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977) ("The Government bolstered its statistical evidence with the testimony of individuals who recounted over 40 specific instances of discrimination.").
 
 
 25
 The record in this case discloses no such "gross statistical disparity," corroborated by no such anecdotal evidence. The percentage of black troopers in the MSP rose from 9.5% in 1980 to 17.1% in 1991 (see Table 1), so that it now nearly matches the percentage of blacks in the relevant qualified labor pool (18.8%).[3] While black troopers remain concentrated in the lower ranks, Table 1 indicates that their percentages have been rising in the upper ranks as well, as they have advanced through the one-rank-at-a-time promotional system of the Maryland State Police. The rank-by-rank comparison to equivalent census job categories in Table 3 likewise reveals no "gross disparity"; indeed, if the equivalent job categories are compared to the 1991 composition of the MSP, the disparity in some ranks disappears. Compare Table 1 (in 1991, 10.9% of sergeants were black; 9.6% of first sergeants were black) with Table 3 (in 1980, 10.7% of "police supervisors," the equivalent of sergeants and first sergeants, were black). In Teamsters, by contrast, the evidence disclosed what the Court of Appeals had termed an "inexorable zero" of minorities in the line-driver job at issue. 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23. Of the 1,828 line drivers employed by the trucking company in that case, only 5 (0.3%) were Hispanic and only 8 (0.4%) were black, and the company had hired the black drivers after commencement of the lawsuit. Id. at 337, 97 S.Ct. at 1855.
 
 
 26
 The paucity of evidence of racial discrimination in this case is most apparent by comparison to United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), in which the Supreme Court did approve a court-ordered plan with numerical preferences for the Alabama Department of Public Safety. In 1972, the district court found initially that the ADPS was systematically excluding blacks from employment as state troopers. Id. at 154, 107 S.Ct. at 1057. In 1974, the court found that the ADPS was still employing a number of discriminatory tactics to keep blacks from becoming permanent state troopers: restricting the size of the entry-level class; not selecting the best-qualified blacks to become permanent troopers so as to encourage later black attrition; disciplining black troopers more harshly than whites; and treating whites more favorably in training and testing. Id. at 156-57, 107 S.Ct. at 1058-59. In 1979, the court ordered the ADPS to develop a nondiscriminatory promotional procedure. Id. at 157, 107 S.Ct. at 1059. By 1983, the ADPS had not yet done so, and had not promoted any black troopers above the rank of corporal. Id. at 163, 107 S.Ct. at 1062. Accordingly, the district court ordered the ADPS to promote one black trooper for every white trooper until the ranks were 25% black, or until the ADPS developed a nondiscriminatory promotional procedure. Id.
 
 
 27
 The recent history of the MSP is a study in contrast. The district court here made no more than a conclusory finding that the MSP had racially discriminated, in hiring or in promotions. Even in 1985, before the Coalition filed this lawsuit, blacks were represented in the above-corporal ranks of the MSP. See Table 1 (in 1985, 5.4% of sergeants were black; 5.4% of first sergeants were black; 4.8% of second lieutenants were black). And after 1985, without the impetus of a court order, the MSP instituted a new promotional examination system which eliminated the cronyism endemic to the old, and adopted its own Affirmative Action Promotional Plan. We take no position on whether this Plan would have passed constitutional muster, because that question is not before us. We point out only that, constitutional or not, the 1985 Plan rebuts the accusation that a racial animus lingers in the MSP.
 
 
 28
 In sum, the record in this case is devoid of anything approaching the "gross disparity" that must be present when statistics are offered as a predicate for race-conscious relief. A race-conscious remedy is simply too drastic a measure to rest upon the slender reed of appellees' statistical comparisons. The most the appellees have proven by their evidence is that the MSP was once vulnerable to parochial practices that undermined its effectiveness. One remedy for such parochialism is to widen the hiring net to all those persons, black and white, who previously lacked an inside track to this form of public employment. Another is to retain an outside firm to develop a more honest and open promotional system, as the MSP did here. Such remedies are a far cry, however, from the adoption of numerical preferences based explicitly on race.
 
 IV.
 
 29
 Appellees argue finally that affirmative action is warranted, because in their view the recent progress of black Maryland state troopers has resulted from the affirmative action taken by the MSP in the past: the 1974 consent decree, and the 1985 Plan. Until the upper ranks of the MSP achieve a black composition commensurate with the black composition of the relevant qualified labor pool, they say, race-based preferences are necessary to protect against backsliding.
 
 
 30
 First of all, this argument belies appellees' assertion that the 1991 Consent Decree does not impose hard-and-fast racial quotas. In the end, appellees cannot escape the reality that these preferences will deny some persons the opportunity to be a state trooper or to advance as a state trooper solely because they belong to a certain race. The Constitution simply will not allow opportunity in employment to be compromised on so invidious a ground. Appellees' argument also rests, once again, on the illicit assumption that statistical comparisons represent the true measure of racial equality. Their position betrays a disturbing tendency to attribute racial progress to the beneficence of the employer, rather than to the individual initiative of the black employees who have risen through the ranks.
 
 
 31
 Finally, we reject appellees' argument because it presumes that race-conscious relief must end later rather than sooner, and because it postpones the day when the constitutional promise of equality before the law can be achieved. The case against race-based preferences does not rest upon the sterile assumption that American society is untouched or unaffected by the tragic oppression of its past. Rather, it is the very enormity of that tragedy that lends resolve to the desire never to repeat it, and to find a legal order in which distinctions based on race shall have no place.
 
 V.
 
 32
 For the foregoing reasons, the judgment of the district court is reversed and remanded with instructions that intervenor's objections to the hiring and promotional goals in the Consent Decree be granted.
 
 
 33
 REVERSED AND REMANDED.
 
 
 
 [1]
 Trooper First Class
 
 
 [2]
 The qualifications of a MSP trooper are actually more detailed. In addition to the aforementioned criteria, an MSP trooper must have a valid driver's license; must be in excellent physical condition; must be of good moral character; must have at least 20/70 vision in each eye, correctable to 20/20 with glasses or soft contact lenses; must have normal color discrimination and depth perception; and must have a field of vision of 170 degrees. Special positions like Trooper Medic and Trooper Pilot have additional qualifications. Since census data is not so refined, however, the district court permitted the parties to ignore these additional criteria in making the statistical comparison
 
 
 [3]
 The district court incorrectly used 22% as the baseline figure against which "to assess underrepresentativeness" in each of the MSP ranks. As detailed above, according to 1980 census data, only 18.8% of Maryland high school graduates between the ages of 21 and 59 were black. The district court used the 22% figure because 22.2% of Maryland high school graduates between the ages of 21 and 29 were black, reasoning that the 21-29 age group was the population from which the MSP hired most new troopers. At most, however, this rationale establishes 22% as an appropriate baseline for current entry-level classes. Troopers in the upper ranks of the MSP came from earlier entry-level classes. Unless the percentage of blacks among Maryland high school graduates between the ages of 21 and 29 has always been 22%--a hypothesis belied by the 18.8% figure--22% is an inappropriate baseline against which "to assess underrepresentativeness" in the upper ranks of the MSP
 In any event, even the 22% figure fails to establish the requisite "gross disparity" between the composition of blacks in the MSP and the composition of blacks in the relevant qualified labor pool.