Marc ALEXANDER, et al., Plaintiffs,

v.

PRINCE GEORGE'S COUNTY, MARYLAND, et al., Defendants.

Civ. Nos. AW–93–2636, AW–94–2090.

United States District Court, D. Maryland.

Oct. 11, 1995.

Daniel F. Goldstein, Joseph B. Espo, Balti-more, Md., for Plaintiffs.

Henry R. Lord, Ann L. Lamdin, Leonard E. Cohen, Baltimore, MD., for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

The Plaintiffs commenced this case chal-lenging the Prince George's County Fire De-partment's ("County" or "Department") deci-sion not to hire them as firefighters. They contend that they would have been hired if not for the Department's affirmative action plan (the "Plan"). They maintain that the Plan is unconstitutional and have brought this action under 42 U.S.C. §§ 1981 and 1983 seeking damages and injunctive relief.

Presently before the Court is the Defen-dants' motion for summary judgment. The Plaintiffs have filed a cross-motion for partial summary judgment. The Court has held a

hearing in this matter and closely reviewed the memoranda and exhibits filed by the parties.[1] For the reasons that follow, the Court will grant the Defendants' motion.

## I. Factual Background

The relevant facts in this case are undisputed. The Plaintiffs are six white males and one white female. Plaintiffs Marc Alexander, Timothy Clark, George Frye, Robert Moore, Angela Moore, and Richard Saxberg applied for firefighter positions with the Department in 1993. The Department hired thirteen individuals in that class of firefighters, but it did not hire any of the Plaintiffs. Mr. Alexander, Mr. Frye, and Ms. Moore applied for firefighter positions again in 1994, however, Mr. Clark, Mr. Moore, and Mr. Saxberg did not. In that same year, Plaintiff Josh Reedy applied to the Department for the first time. The Department hired Mr. Alexander and Ms. Moore in 1994; it did not offer positions to Mr. Frye and Mr. Reedy.

The Plaintiffs have brought this suit against Prince George's County, Maryland. The Second Amended Complaint also names as Defendants M.H. Estepp, William Goddard, III, Maureen Hennessy, and Yvonne Tyler. These individuals are officers of the Department, and the Plaintiffs claims against them are in both their individual and official capacities.

## A. The Hiring Process

Since 1984, the Department has used the same procedure to hire firefighters. Applicants are first given a written examination. Those applicants that score 60% or higher on the exam are then orally interviewed. Hennessy Dep. I at 43. Applicants are then placed on the Applicant Register based on their combined score on the written exam (60%) and oral interview (40%). Paper No. 65, Ex. 4—Response to Interrogatory 13.

The Applicant Register is then divided into three categories or bands—Outstanding, Well–Qualified, and Qualified. The band

ranges for the 1993 and 1994 applicants were:

Outstanding—95.50–100.00

Well–Qualified—75.00–95.49

Qualified—60.00—74.99

Paper No. 65, Ex. 5—Response to Interrogatory 12. Within each band, applicants are listed in order based on the preference, if any, to which they are entitled to under County law. The preferences are:

1. P.G. Employees seeking promotions

2. disabled veterans

3. volunteer firefighters who are also veterans

4. veterans who are not disabled

5. volunteer firefighters who are not veterans

6. displaced homemakers who are not veterans

7. P.G. County residents

8. all other persons

Applicants within the same band with the same preference are listed in order based on their combined test scores. Paper No. 65, Ex. 4—Response to Interrogatory 13. All applicants within a given band are considered equally qualified for hire. Knapp Dep. at 26.

Selections are made first from the Outstanding band. If that band is exhausted, selections are made from the Well–Qualified band. The Department has never hired a firefighter from the Qualified band. Goddard Aff. I at ¶ 5.

As part of its hiring process, the Department utilizes its Plan. Based on the County's population, the Plan simply provides goals for the hiring of female and minority candidates; it does not mandate the hiring of unqualified persons. Paper 65, Exs. 11 and 12. For example, if there are not enough qualified minority or female candidates, the goals are lowered appropriately. Goddard Aff. I at ¶ 6. The Plan, then, does not require the hiring of a certain number of females or minorities.

---

1. The docket sheet lists as pending the Defendants' motion for summary judgment filed in August of 1994 (Paper No. 39) and the Plaintiffs' motion to compel filed that same month (Paper No. 51). Counsel indicated that these matters were moot, and the Court denied them as moot at the hearing.

Again, the focus of this suit is the County's hiring in 1993 and 1994. The Department hired thirteen individuals in its 1993 class of firefighters. The 1994 class had seven members (though it wanted to hire eight) including Mr. Alexander and Ms. Moore.

## B. *The Individual Plaintiffs*

### 1. *George Frye*

Mr. Frye's combined score was 77.80. This score placed him in the Well–Qualified band with a preference as a "volunteer firefighter." He was number 26 on the February 1993 Applicant Register. The four white males hired that year each were taken from the Outstanding band. Goddard Aff. I at ¶ 7. Mr. Frye remained at 26 on the June 1994 Applicant Register. The three white males hired that year were from the Outstanding band or were in the Well–Qualified band and had a higher preference than he did. Goddard Aff. II at ¶ 4.

### 2. *Marc Alexander*

Mr. Alexander's combined score was 94.6, placing him in the Well–Qualified band with a volunteer preference. He was number 14 on the register. Like Mr. Frye, he was not hired in the February 1993 class. Goddard Aff. I. at ¶ 8.

A mathematical error in scoring his written exam was later discovered. Accordingly, his June 1994 combined score was 93.4, placing him once again in the Well–Qualified band. He now had the highest preference because of his employment with the County as a paramedic. He was hired in this class of firefighters. Goddard Aff. II at ¶ 5.

### 3. *Richard Saxberg*

Mr. Saxberg's combined score of 79.09 placed him in the Well–Qualified band. He was approximately number 164 on the February 1993 register and was not hired. Goddard Aff. at ¶ 9. He was not included in the June 1994 register as he did not maintain his eligibility for hire. Goddard Aff. II at ¶ 6.

### 4. *Angela Moore*

Ms. Moore's combined score of 83.32 placed her in the Well–Qualified band in 1993. She also had a volunteer preference. However, she was not hired then as the four females in that class had a higher scores and preferences. Goddard Aff. I at ¶ 20. Her score remained the same and she was hired in 1994 in accordance with the Department's goals of hiring qualified applicants. Goddard Aff. II at ¶ 7. It should be noted that Ms. Moore challenges the Plan only so far as it applies to race.

### 5. *Robert Moore*

Mr. Moore's combined score was 73.90. This score placed him in the Qualified band with no preference in 1993. Goddard Aff. I at ¶ 11. As noted above, the Department has never needed to hire anyone from this band. He did not maintain eligibility for the 1994 class. Goddard Aff. II at ¶ 8.

### 6. *Timothy Clark*

Mr. Clark's combined score was 66.84, placing him in the Qualified band in 1993. He was not included in that class (Goddard Aff. I at ¶ 12) and did not maintain his eligibility for the 1994 class (Goddard Aff. II at ¶ 9).

### 7. *Josh Reedy*

Mr. Reedy only applied for the Department's 1994 class. His combined score of 81.48 place him in the Well–Qualified band. He was not hired in that class as the three white males hired either were in the outstanding band or had a higher preference than he did. Goddard Aff. II at ¶ 10.

## II. *Summary Judgment Principles*

Summary judgment is appropriate when there is no genuine dispute of material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317,

327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (citations omitted). *See also Bland v. Norfolk and Southern Railroad Co.*, 406 F.2d 863, 866 (4th Cir.1969).

In determining whether genuine and material factual disputes exist, resolution of which requires trial, the Court has reviewed the parties' respective memoranda and the many exhibits attached thereto, construing all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiffs. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Applying these principles to the record in this case, the Court concludes that summary judgment for the Defendants must be granted.

III. *Discussion*

Before addressing the merits of the Plan, the Court must first address several other issues raised by the parties. The Court will address each of these issues in turn.

A. *Plaintiffs' Claims of Inappropriate Practices*

■ The Plaintiffs first contend that the Department "played with the process" to ensure the hiring of minority applicants. Paper No. 67 at 16–18. Specifically, they allege that they were each "harmed by one or more of the following practices:

(a) altering of test scores;

(b) discriminatory application of the time between permitted retests;

(c) alteration of oral interview scores;

(d) discriminatory method of granting volunteer firefighter status;

(e) the discriminatory setting of employment bands; and

(f) the illegal use of race and gender preferences in offering employment."

Seconded Amended Complaint at ¶¶ 59 and 69.

The Plaintiffs do not have sufficient evidence to withstand the Defendants' motion for summary judgment on these claims. For example, the Defendants specifically deny altering written test scores. Goddard Aff. I at

¶ 13. All but two of the Plaintiffs conceded that they have no reason to think that their test scores were altered. *See* Saxberg Dep. at 35; R. Moore Dep. at 21–22; Frye Dep. at 23–24; Reedy Dep. at 67; A. Moore Dep. at 21–22. Moreover, Mr. Alexander has not demonstrated any harm from a scoring error that resulted in raising his test score and that wasn't discovered until after the February 1993 class was hired. Alexander Dep. at 16–20; Goddard Aff. I at ¶ 8. Additionally, Mr. Clark has only stated that, after reviewing his exam, "a lot of the answers did not seem like the answers I put on the paper." Clark Dep. at 8. Such speculation is insufficient to withstand the motion for summary judgment. Fed.R.Civ.P. 56(e); *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129–30 (4th Cir.1987).

The Plaintiffs also fail to present sufficient evidence in support of their allegations of lowering oral interview scores. Again, most of the Plaintiffs admit that they have no reason to think that the Defendants altered their scores. *See* Saxberg Dep. at 36; R. Moore Dep. at 21–22; Frye Dep. at 24; Reedy Dep. at 67–68; A. Moore Dep. at 21–22; Alexander Dep. at 16. The Plaintiffs rely on irrelevant evidence—the alleged altering of an applicant's score who is not a plaintiff (Paper No. 67 at 17) and speculation—a personal belief that the Department officials were more helpful to minority applicants (Paper No. 67 at 18). Again, such evidence is insufficient. *Felty*, 818 F.2d at 1129–30.

Plaintiff Timothy Clark does allege that his interview score was altered based on a statement from Lt. Brian Larman to Mr. Clark's mother. Lt. Larman allegedly told her that he gave Mr. Clark a 100 and that the other two examiners scored him 100 and 95. Clark Dep. at 6. Lt. Larman denies making such a statement (Larman Dep. at 4–5; 47) and Clark's actual score was 63.61 (Goddard Aff. I at ¶ 12). Moreover, taking this alleged statement as true, there is still no evidence that Mr. Clark's score was altered *because* of his race or gender. Furthermore, assuming his oral interview score was 100, he still would not have been selected. Goddard Aff.

I at ¶ 12. Therefore, summary judgment on this claim must be for the Defendants.

Finally, there is no evidence to support the Plaintiff's other claims of "playing with the process." There is no evidence that the Defendants denied white males the opportunity to retest or granted volunteer preferences on the basis of race. The Defendants specifically deny having such a policies. Goddard Aff. I at ¶¶ 14, 16. There is also no evidence that the Plaintiffs were harmed by the setting of the employment bands. Accordingly, summary judgment must be for the Defendants on these claims.

### B. *Standing*

■ To pursue this action, the Plaintiffs must first demonstrate that the challenged policy has caused them an actual injury that can be redressed through judicial action. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). This requirement of standing insures that litigants have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of the issues upon which the court so largely depends..." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The Defendants argue that only Plaintiff Reedy has standing to pursue this suit. It is undisputed that only thirteen applicants were hired for 1993, and that only seven were hired in 1994. It is also undisputed that none of the Plaintiffs ranked in the top thirteen on the Applicant Register for 1993. For 1994, Plaintiffs Reedy and Alexander were ranked in the top eight on the Applicant Register, and Alexander was in fact selected. Thus, the Defendants argue that because they would not have been hired even there was no affirmative action plan, the Plaintiffs other than Reedy lack standing. *See, e.g., Bertoncini v. City of Providence,* 767 F.Supp. 1194, 1197–99 (D.R.I.1991) (only plaintiffs ranked 60th or higher on eligibility list demonstrated irreparable harm necessary for injunctive relief when only 60 openings available).

■ The Court is not persuaded by this argument. In cases under the Fourteenth Amendment, "the denial of equal treatment resulting from the imposition of the barrier" is the injury for standing purposes. *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993). *See also Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 280–81, n. 14, 98 S.Ct. 2733, 2742–44, n. 14, 57 L.Ed.2d 750 (1978). The Defendants maintain that this rule does not apply as the Plan only provides preferences, not strict set asides. However, the Court does not read the rule so narrowly. Here, the alleged injury is that the Plan is a "barrier that either created a discriminatory obstacle or had the effect of producing unequal access" to employment with the Department. *Hopwood v. State of Texas,* 861 F.Supp. 551, 569 (W.D.Tex.1994) (unsuccessful applicants have standing to challenge law school's affirmative action program although it only provided for preferences). Therefore, the Court finds that the Plaintiffs each have standing in this case.

### C. *1993 Applicant Register*

■ The Court will consider the 1993 Applicant Register (Paper No. 65, Ex. 1) despite the Plaintiffs' objections. The Plaintiffs contend that the document, which is simply a list of the applicants for firefighter positions in 1993, is hearsay. However, the applicant register is continually updated as part of the hiring process. Goddard Aff. III at ¶ 5. The Defendants created the 1993 Applicant Register by reinserting the names of those that for one reason or another dropped off the list so that a comprehensive list is available. Thus, it is a business record that would be admissible at trial under Fed.R.Evid. 803(6), (8).

### D. *Authority to Adopt the Plan*

■ The Plaintiff argue, in part, that the Department did not have authority to adopt the Plan. Without such authority, the Plan cannot stand. *See, e.g., Concrete General v. Wash. Suburban Sanitary Com'n.,* 779 F.Supp. 370 (D.Md.1991).

The Court finds that the Department had authority to adopt its Plan. It is undisputed that the P.G. County Council required the County Executive to establish an affirmative action plan by executive order. P.G. County Code, § 16–109(b) (Paper No. 65, Ex. 9). The County Executive issued an Order pursuant to the Council's instruction, and the Plan continues under this Order (Paper 65, Ex, 11). Finally, "formal findings of discrimination need neither precede nor accompany the adoption of affirmative action." *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1565 (11th Cir.1994) (citations omitted). Accordingly, the Court finds that the Department had authority to adopt the Plan.

### E. *Strict Scrutiny*

■ It is well-settled that classifications based on race must be evaluated under the strict scrutiny standard.[2] *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989); *Hayes v. North State Law Enforcement Officers Ass'n.*, 10 F.3d 207, 212 (4th Cir.1993). Under this standard, the classification must be based on a "compelling interest" and the affirmative action plan must be "narrowly tailored." *Hayes*, 10 F.3d at 212 (citations omitted). The Supreme Court has recently reminded us that application of strict scrutiny should not be considered fatal to affirmative action plans.[3] *Adarand Constructors, Inc. v. Pena*, —— U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995) (citations omitted).

■ 1. *Compelling Interest*—To show a compelling interest, the County must show more than general societal discrimination. *Croson*, 488 U.S. at 498–99, 109 S.Ct. at 724–25. Instead, the County must specify the past discrimination that it is responsible for that it is targeting with its Plan. *Id.* at 500, 109 S.Ct. at 725. Moreover, the County must demonstrate that its past discrimination

has present effects. *Podberesky v. Kirwan*, 956 F.2d 52, 56 (4th Cir.1992) (citations omitted). Proof of past discrimination generally includes statistical evidence of discrimination and anecdotal evidence. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 338, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977).

■ The Defendants have presented extensive statistical evidence of discrimination. The Department first implemented a minority recruitment program in 1974. At that time, out of 290 firefighters, only approximately eight of its firefighters were minorities, and there were no women in the Department. Goddard Aff. I at ¶ 19. The County's labor force was then approximately 41% female and 17% minority. Paper 65, Ex. 10. The County's efforts were largely unsuccessful, and, in June of 1977, only twelve of the firefighters were minorities and there were still no women firefighters. Goddard Aff. I at ¶ 20.

One of the major obstacles to the recruitment of minorities was the firefighter examination. Firefighters are generally considered entry-level employees. *Peightal v. Metropolitan Dade County*, 815 F.Supp. 1454, 1463 (S.D.Fla.1993), *aff'd*, 26 F.3d 1545 (11th Cir.1994) (citations omitted). This examination, however, required knowledge gained through experience as a firefighter. The only individuals with such experience were volunteer firefighters, and the volunteer firefighter organizations in the County were almost exclusively white male. Goddard Aff. I at ¶ 21. Therefore, as a result, the Department remained almost solely white male.

In 1979, the County Executive issued a written affirmative action plan for Prince George's County. Its goal was to increase participation by minorities so that within five years the firefighter ranks would more closely represent the entire local labor force. The

---

**2.** The Plaintiffs brought this action pursuant to 42 U.S.C. § 1981 and 1983. Because the Court finds that the Plan survives scrutiny under Section 1983, it necessarily survives Section 1981 analysis. *See Stuart v. Roache*, 951 F.2d 446, 455 (1st Cir.1991), *cert. denied*, 504 U.S. 913, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992).

**3.** Gender based classifications are subject to "intermediate scrutiny." *Faulkner v. Jones*, 10 F.3d 226, 231 (4th Cir.1993). Under this test, the classification must be "substantially related to an important governmental objective." *Clark v. Jeter* 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988). The Court will address both aspects of the Plan together for convenience.

force was then 96% white male and had no females. Goddard Aff. at ¶ 22.

In 1980, because of its blatant discrimination, the Office of Revenue Sharing of the Department of the Treasury ("ORS") threatened to cut off funding to the Department if it did not act to alleviate its hiring disparities. Paper No. 68 at Ex. 1. The ORS found that the County's relevant labor force was 40.7% female and 16.5% minority, but that the Department was only 1.4% female and 9.9% minority. The ORS required the Department to provide annual reports regarding its progress in curing this disparity. Goddard Aff. I at ¶ 23.

In 1984, pursuant to Section 16–109 of the County Code, the Department adopted a new plan. The 1980 census reported the County's labor force as 47.4% female and 41.5% minority. Paper No. 65, Ex. 10. However, the Department was only 3% female and 19% minority. The Department, therefore, set its five-year goals at 10% female and 40% minority for firefighters. Goddard Aff. I at ¶ 25.

As part of its plan, the Department used new recruiting strategies. These included recruiting at area colleges, advertising in ethnic newspapers, and employing a full-time minority recruitment officer. Goddard Aff. I at ¶ 26.

These efforts were of limited success. By 1987, the Department was 27% minority but was only 2% female. In 1989, the number of females in the Department increased when the Paramedic trainee and Paramedic I/II classes were transferred from the Department's Technician job category into the Protected Services category that previously was reserved for firefighters. Approximately 40% of the transferred paramedics were women. Paper No. 65, Ex. 14. Consequently, at the end of 1989, the Department was 11% female and 29% minority. Goddard Aff. I at ¶ 28.

By end of the 1993, the Department's Protected Services category was 15% female and 38% minority. The Department's affirmative action goals had not been achieved. Paper No. 65, Ex. 11. The County planned to increase its goals in light of the 1990 census which indicated that the County's labor force was 49.9% female and 57.5% minority. Goddard Aff. I at ¶ 29.

■ The Plaintiffs first argue that there is no valid statistical evidence of discrimination. They argue that the County is not using the relevant statistics as firefighters are not drawn from the general county population, but instead must have a high school diploma. However, the courts have found that there are no special eligibility requirements for firefighters and have used similar statistical comparisons. *Peightal,* 815 F.Supp. at 1463 (citations omitted). Thus, the Defendants are using the proper statistical comparisons.

In addition, the Plaintiffs argue that in fact the evidence demonstrates that there has been no past discrimination by the Department. The Plaintiffs rely largely on one case for that proposition. *See Allen v. Prince George's County,* 538 F.Supp. 833 (D.Md. 1982), *aff'd,* 737 F.2d 1299 (4th Cir.1984) (no showing of discriminatory practice in county's hiring). However, that case specifically does not apply to the County's Fire Department. *Allen,* 538 F.Supp. at 836. The Plaintiffs also place great reliance on testimony of members of the Department who stated that they were not personally aware of discrimination by the Department. Paper No. 67, Ex. 2 at 59; Ex. 23 at 28–29. These officials, however, cannot speak to the Department's prior history. In addition, simply because they were unaware of the discrimination does not mean it did not exist. Accordingly, the Court finds that the Department's statistical evidence establishes a compelling interest to support the Plan.

The Defendants have also presented anecdotal evidence of discrimination in the volunteer fire companies.[4] These companies have

---

4. The Court notes that certain evidence submitted by the Defendants is unpersuasive in this regard. For instance, assuming that diversity alone can serve as a compelling interest, Chief Edwards statements (Edwards Dep. at 33–35) do not show a compelling state interest in this case. *See Hayes v. North State Law Enforcement Officers, Ass'n.,* 10 F.3d 207, 213–215 (4th Cir.1993) (testimony of police chief alone as to merits of diversity in police force not enough to show a

traditionally denied memberships to or otherwise discouraged minority and women applicants. For instance, it was commonly known that blacks were not wanted in the companies. Harrod Dep. at 25–26. Black applicants were sent to the "all black station." Grooms Dep. at 66–69. Also, black volunteers were hazed more severely than their white counterparts. Joy Dep. at 62–63. Finally, the other volunteers routinely referred to blacks as "niggers." Allen Dep. at 63.

In addition, women volunteers were subjected to repeated abuse. One woman was told that she couldn't join because she was not a white male property owner. Hennessy Dep. II at 104–05. Women were encouraged not to join (Henry Dep. at 40); they were often called "slut" and "bitch" (Redding Dep. at 102–03; Allen Dep. at 59); most of the stations did not have separate restrooms or sleeping facilities for women (Hennessy Dep. II at 105–08; Redding Dep. at 105–06); one volunteer reported that a male entered the shower area while she was in the shower (J. Edwards Dep. at 64–65); and one volunteer was tied to a pole and sprayed with shaving cream (Hennessy Dep. II at 107). In short, women "weren't wanted." Redding Dep. at 102; Allen Dep. at 57–58.

These attitudes carried over into the Department itself. For example, blacks were not allowed to drive the trucks as soon as whites. Grooms Dep. at 21; Joy Dep. at 21–22; Jones Dep. at 15–16. Also, other firefighters often referred to them as "nigger." Grooms Dep. at 26–27, 40; Powell Dep. at 23–25. In still another incident, a black firefighter came into work one morning to find on his desk a cross inscribed with "R.I.P." and decorated with a sheet designed like a Klansman's hood. Grooms Dep. at 39–40. Members of the Department found this sort of behavior amusing. Grooms Dep. at 39–40.

Similarly, there were repeated instances of harassment and discrimination against female firefighters. Offensive comments were hardly uncommon (Norton Dep. at 17–21) and the comments sometimes escalated into offensive touching (Norton Dep. at 25). Female firefighters also endured being shown X-rated movies (J. Edwards Dep. at 33) and being told they were there to "sleep their way to the top" (Redding Dep. at 21). Finally, like blacks, women were not allowed to drive fire apparatus. Hennessy Dep. II at 51. In sum, it was well known that females and minorities were not welcome in the Department. Goddard Aff. I at ¶ 21.

Furthermore, although the situation in the Department has greatly improved, there remain lingering effects of the Department's past discrimination. For instance, it is still regarded as a male dominated profession where women are not wanted. J. Edwards Dep. at 67–68. Women are still harassed in the Department. J. Edwards Dep. at 45–46. Also, the Department has still not met its goals for hiring minorities and women. Powell Dep. at 43. Additionally, the "good old boy" network still operates to help prevent the hiring of blacks. Grooms Dep. at 71. Thus, the Court finds that there are present effects of the Department's past discrimination.

The Plaintiffs do not deny that there have been racist and discriminatory actions taken against minorities in the past by the volunteer companies. Instead, they argue that the evidence of discrimination must result from the Department's own hiring policies. They maintain that the actions of the volunteer companies are not attributable to the County. See *Krieger v. Bethesda–Chevy Chase Rescue Squad*, 599 F.Supp. 770 (Md.1984), *aff'd*, 792 F.2d 139 (4th Cir.1986) (volunteer rescue squads are not state actors).

The disparities within the Department, however, are a natural consequence of the Department's hiring policies. For example, the Department's examination, as recently as 1978, favored those with volunteer experience. Powell Dep. at 10–12; Joy Dep. at 15–17; Harrod Dep. at 24–27; Jones Dep. at 9–10. Moreover, the Department did most of its advertising through word of mouth at the volunteer stations. Goddard Aff. I at ¶ 19. Naturally, women and minorities did not learn about job openings under these circumstances. The Department cannot simply at-

___

compelling interest). Evidence of general societal discrimination (Paper 65, Ex. 16) also does not advance their case. *Croson*, 488 U.S. at 498–99, 109 S.Ct. at 724–25.

tribute these blatant discriminatory policies to the volunteer organizations. *See Ensley Branch N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1566–67 (11th Cir.1994) (discrimination against blacks at entry level naturally led to discrimination against blacks in promotion) (citations omitted). *See also Adickes v. Kress Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970) (state action exists when private individuals act in concert with state officials). Therefore, the Court finds that the Department has shown the necessary compelling interest to support an affirmative action plan.

■ 2. *Narrowly Tailored*—An affirmative action plan must be "narrowly tailored to the achievement of that goal." *Croson,* 488 U.S. at 505–07, 109 S.Ct. at 728–29. In determining whether a plan is narrowly tailored, the courts have considered several factors: (1) the efficacy of alternative remedies; (2) the planned duration of the remedy; (3) the relationship between the percentage of minority workers to be employed and the percentage of minority groups in the relevant population; (4) availability of waiver provisions; and (5) the effect of the plan on innocent third parties. *United States v. Paradise,* 480 U.S. 149, 187, 107 S.Ct. 1053, 1075, 94 L.Ed.2d 203 (1987); *Hayes,* 10 F.3d at 216 (citations omitted).

i. *Alternative Remedies*—

The Plaintiffs argue that alternative steps can be used instead of the Plan. They contend that simply making an effort to recruit minorities will be effective and eliminating the preference for volunteers can alleviate the effects of past discrimination. In short, they maintain that the Plan is not necessary.

■ The Court is not persuaded by this argument. The alternative remedies (e.g., changing the written test and intensifying minority recruitment) attempted were not effective in achieving the goals of the Plan. Paper No. 65, Exhibit 14. Finally, the Department may take affirmative steps to remedy past discrimination rather than simply forbidding discrimination in the future. *Adarand Constructors, Inc.,* — U.S. —, ——, 115 S.Ct. 2097, 2131 (Souter, J., dissenting) (citations omitted).

■ ii. *Duration*—An affirmative action plan will not pass strict scrutiny if it is of unlimited duration. *Hayes,* 10 F.3d at 216–217; *Maryland Troopers Ass'n., Inc. v. Evans,* 993 F.2d 1072, 1076 (4th Cir.1993) (plans "may not take on a life of their own."). The Plaintiffs argue that the Plan suffers from this weakness. They contend that the County will continue the plan as long as the firefighters do not exactly mirror the County wide population.

The Court is not persuaded by this argument. The Plan is limited in duration and is reviewed annually to see if its goals have been achieved. Knapp Dep. at 11–12; 18; 52. Moreover, there is no evidence to support the Plaintiff's argument. Accordingly, the Court finds that the Plan has a limited duration. Fed.R.Civ.P. 56(e).

iii. *Relationship Between Work Force and Population*—

The Department's Plan is designed to remedy present racial and gender imbalances resulting from past discrimination. As noted above, the County may use the general labor force as a comparison in choosing its firefighters. *Peightal,* 26 F.3d at 1553–55 (citations omitted). The Department, of course, should utilize goals that reflect the current population of the County. *Mackin v. City of Boston,* 969 F.2d 1273, 1276–77 (1st Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993). Thus, the Court finds that the Plan is narrowly tailored in this regard. Paper 65, Ex. No. 14.

iv. *Waiver Provisions*—An important attribute of the Plan is its flexibility. The Plan does not require that Department hire a certain number of minorities. For example, in 1993, the County sought to hire five female applicants. However, when five could not be found in the outstanding or well-qualified bands, it chose to hire only four. Goddard Aff. I at ¶ 6. Accordingly, the Plan does not have the trappings of a quota, and the availability of waivers shows that the Plan is narrowly tailored. *See generally Mackin v. City of Boston,* 969 F.2d at 1278.

v. *Impact on Innocent Third Parties*— The Plan does not have a severe impact on innocent third parties. First, it does not bar hiring, and the Department continues to hire many white males. Paper 65, Exhibit 13— Response No. 8. Denial of a possible employment opportunity is less drastic than terminating an existing employee based on race. *Paradise,* 480 U.S. at 189, 107 S.Ct. at 1076 (quoting *Wygant,* 476 U.S. at 282–83, 106 S.Ct. at 1851–52). Moreover, the Plan only gives a preference, not a guarantee of employment, to well-qualified minorities. *Mackin,* 969 F.2d at 1278 (citations omitted). Finally, as noted above, all individuals within a given band are regarded as equally qualified for hire. Therefore, in light of each of these factors, the Court concludes that the Plan is narrowly tailored.

F. *Claims Against Defendants in Their Individual Capacities*

 The Plaintiffs have also raised claims against Defendants Estepp, Goddard, Hennessy, and Tyler in their individual capacities. Of course, qualified immunity protects government officials "performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted).

Assuming *arguendo* that the Plan is unconstitutional, the Court finds that these Defendants are entitled to qualified immunity in this case. They acted pursuant to an affirmative action plan as instructed by the County Council and Executive. The Plan can hardly be said to so clearly violate the *Croson* standard that individual liability is warranted. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1985) (citations omitted).

Accordingly, the Defendants' motion will be granted and the Plaintiff's motion will be denied. A separate Order will issue.

*ORDER*

In accordance with the Memorandum Opinion, it is this 11th day of October 1995 ORDERED:

1. That the Plaintiffs' Motion for Partial Summary Judgment BE, and the same hereby IS, DENIED; and

2. That the Defendants' Motion for Summary Judgment BE, and the same hereby IS, GRANTED; and

3. That judgment is ENTERED for the Defendants; and

4. That the Clerk of the Court CLOSE this case and mail copies of the Memorandum Opinion and this Order to all counsel of record.